# AFFIDAVIT IN SUPPORT OF APPLICATIONS FOR A CRIMINAL COMPLAINT AND SEARCH WARRANTS

Background on Affiant.................................................................................................... 2

Background on Investigation .......................................................................................... 3

Purpose of the Affidavit ................................................................................................. 4

Probable Cause............................................................................................................... 6

    Identification of the ALEX DTO and its Modus Operandi.......................................... 6

    Large Seizure of Drugs from Residence and Vehicle of ▮▮▮▮▮▮▮ ........................... 8

    Renewed Investigation into ALEX and DTO's Expanded Operations in Massachusetts........ 12

    July 21, 2025 Controlled Purchase from ALEX and SALDANA MEJIA............................... 12

    July 30, 2025 Controlled Purchase from ALEX and SALDANA MEJIA............................... 14

    August 21, 2025 Controlled Purchase from ALEX and SALDANA MEJIA.......................... 16

    September 3, 2025 Controlled Purchase from ALEX and SALDANA MEJIA ...................... 17

    September 29, 2025 Controlled Purchase from ALEX and SALDANA MEJIA .................... 18

    Change of Vehicles and Change of Drug Runners........................................................ 19

    CASTILLO ENCARNACION ▮▮▮▮▮▮▮▮▮▮ Begin Using Target Vehicles 22

    March 5, 2026 Drug Sale by CASTILLO ENCARNACION Using Target Vehicle 1 ............ 24

    March 18, 2026 Drug Sales by ▮▮▮▮▮▮▮ Using Target Vehicle 2 ................ 25

    Additional Information on Target Locations.................................................................. 29

Requested Authority...................................................................................................... 36

    Drug Traffickers' Use of Residences and Cell Phones Generally ................................ 36

    Seizure of Computer Equipment from the Target Locations or Target Vehicles ........... 43

    Unlocking Seized Devices Using Biometric Features .................................................. 44

I, John Corridan, being duly sworn, hereby state as follows:

**<u>Background on Affiant</u>**

1.      Since October 2020, I have been a full-time police officer with the Bedford Police Department in New Hampshire.  In March 2022, I was assigned to the Detective Bureau at the Bedford Police Department. In May 2023, I was assigned as a Task Force Officer ("TFO") to the Drug Enforcement Administration ("DEA") in Manchester, New Hampshire.  I am a "federal law enforcement officer" within the meaning of Fed. R. Crim. P. 41(a)(2)(C) and authorized to apply for the requested criminal complaint and search warrants.

2.      Prior to my employment as a police officer for the Bedford Police Department beginning in 2020, I was a full-time police officer in Massachusetts for seven years.  As part of my training as a police officer, in June 2013, I graduated the 23-week police academy held by the Municipal Police Training Committee.  While at the academy, I received over 200 hours of training in criminal laws and investigations.  In January 2021, I passed the New Hampshire Police Standards and Training Counsel exam and received full certification for the State of New Hampshire.  I hold a bachelor's degree in criminal justice from Saint Anselm College.

3.      Over the course of my career, I have received hundreds of hours of training in the field of narcotics investigations and enforcement.  I have participated in all aspects of drug investigations, including physical surveillance, the coordination and supervision of undercover transactions, the execution of search warrants and arrest warrants, and the debriefing of defendants, informants, and witnesses with personal knowledge regarding drug trafficking.  I have also reviewed numerous recorded communications regarding drug trafficking, and analyzed significant amounts of data from telephone records, financial records, and drug ledgers and other records.

4.      Through my training and experience, I have become familiar with how illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such drugs. I am familiar with controlled substances, the associated paraphernalia, the prices of various substances, and the common terminology used to refer to these substances. I am also familiar with drug traffickers' methods of operation, including methods used by them to distribute, store, transport, and sell drugs, as well as methods used to collect, expend, account for, transport, and launder drug proceeds. I am also familiar with how drug traffickers often use residences and other locations to "stash" or store drugs and drug proceeds, and I am familiar with how drug traffickers use vehicles to transport and distribute drugs and drug proceeds.

### Background on Investigation

5.      Since approximately January 2025, I have been one of the lead agents investigating the criminal activities of ████████████████████████ ███████ "ALEX"). The ongoing investigation has revealed that ALEX is leader of a drug trafficking organization ("DTO") that is distributing fentanyl, methamphetamine, and other drugs in New England. ALEX and others in his DTO are collectively referenced as the "ALEX DTO."

6.      The DEA and its law enforcement partners are investigating the ALEX DTO for violations of 21 U.S.C. § 841(a)(1) (distribution and possession with intent to distribute controlled substances), 21 U.S.C. § 843(b) (use of a communication facility to commit controlled substances offenses), and 21 U.S.C. § 846 (conspiracy to commit controlled substances offenses) (collectively, the "Target Offenses").

7.      The ongoing investigation has shown that the ALEX DTO operates as a drug dispatch operation. Evidence shows that when drug customers call ALEX on the phone to order

3

drugs, ALEX discusses the price, quantity, and type of drugs with the customer and then directs the customer to a particular location; ALEX then directs some co-conspirator or drug runner from the ALEX DTO to deliver the drugs to the customer.  The ongoing investigation has revealed that between 2025 and 2026, the drug runners or co-conspirators of ALEX have included ███████ ████████████ Elizandro Saldana Mejia, Lorenzo Estiberson Castillo Encarnacion, ██ ███████████████████ .

## Purpose of the Affidavit

8.      I submit this affidavit in support of applications for a criminal complaint authorizing the arrest of five individuals and warrants authorizing the searches of four locations and two vehicles.  The applications are as follows:



a.      <u>26-mj-7124-JCB</u>:  a criminal complaint charging ████████ ████████████████████████████ ████████████████████████ (iii) Jancer Elizandro Saldana Mejia ("SALDANA MEJIA"), (iv) Lorenzo Estiberson Castillo Encarnacion ("CASTILLO ENCARNACION"), ████████████████ ███████████████ with conspiracy to distribute controlled substances, in violation of 21 U.S.C. § 846.

b.      <u>26-mj-7125-JCB</u>:  a warrant to search ████████████ ████████████████████████████ ████████████████████████████ ████████████████████████████ ███████████████████████

c.      26-mj-7126-JCB:  a warrant to search the premises at 9 Boxford Street, Apt. 2, Lawrence, Massachusetts ("Target Location 2") for evidence, fruits, and instrumentalities of the Target Offenses. Target Location 2 is believed to be the residence of SALDANA MEJIA.  Target Location 2 is further described in Attachment A-2 and the items to be seized are described in Attachment B.

d.      26-mj-7127-JCB:  a warrant to search the premises at 46 Tewksbury Street, Lawrence, Massachusetts ("Target Location 3") for evidence, fruits, and instrumentalities of the Target Offenses. Target Location 3 is believed to be the residence of CASTILLO ENCARNACION.  Target Location 3 is further described in Attachment A-3 and the items to be seized are described in Attachment B.

e.      26-mj-7128-JCB:  a warrant to search ███████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████████████████████

f.      26-mj-7129-JCB:  a warrant to search a gray 2015 Subaru Impreza bearing Massachusetts registration 5SWR81 ("Target Vehicle 1") for evidence, fruits, and instrumentalities of the Target Offenses.  Target Vehicle 1 is ██████████████ ███████████████████████████████ believed to be used by CASTILLO ENCARNACION and other members of the ALEX DTO.  Target Vehicle 1 is further described in Attachment A-5 and the items to be seized are described in Attachment B.

g.    26-mj-7130-JCB: a warrant to search ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

9.    I am familiar with the facts and circumstances of the investigation described herein based on my personal participation in this investigation and based on information obtained from sources that I believe to be reliable.  The information summarized in this affidavit is included for the limited purpose of establishing probable cause to issue the requested criminal complaint and associated search warrants, and I have not included all information known to me about this investigation or these individuals. My interpretations of conversations, conduct, and events detailed herein are based on my training, experience, and knowledge of this investigation.  All times herein are approximate.

**Probable Cause**

*Identification of the ALEX DTO and its Modus Operandi*

10.    In or about January 2025, the DEA was made aware of a New England-based drug trafficker known as "Alex," who was a large-scale drug supplier with customers in Massachusetts, New Hampshire, and Maine.  A confidential informant provided information that ALEX was using phone number ████████ (the "7491 Number") to conduct drug sales.[1]  Having identified

---

[1]    The identity of this confidential informant is known to law enforcement.  Given the other information contained in this affidavit, the court need not rely on information provided by this confidential informant for purposes of the probable cause analysis.  However, I note that this confidential informant has provided reliable information to law enforcement in the past, and after identifying the 7491 Number associated with ALEX, this confidential informant helped ██

ALEX as a source of supply for drugs, ███████████████████████████████ law enforcement succeeded in introducing an undercover agent ("UC") to ALEX.

11.    In February and March 2025, the UC contacted ALEX at the 7491 Number, and on at least four separate occasions, the UC ordered large quantities of drugs from ALEX.   Over the multiple deals, the UC ordered methamphetamine, fentanyl, and cocaine from ALEX.   In connection with the subsequent drug buys, law enforcement identified ████████████ as a drug runner who delivered drugs for ALEX.

12.    The above-mentioned UC buys generally occurred in New Hampshire and were part of a related New Hampshire investigation.   More recent UC buys from ALEX that were conducted in Massachusetts, which more directly relate to the Criminal Complaint and search warrants now being sought in Massachusetts, are discussed in greater detail below.   For now, what is most relevant about these prior buys in February and March 2025 is that they revealed the *modus operandi* of the ALEX DTO.   Specifically, the investigation revealed that the ALEX DTO was organized as a dispatch operation headed by ALEX.   In short, customers (*e.g.*, the UC) would call ALEX on his customer phone (*e.g.*, the 7491 Number), and ALEX would then send a drug runner (*e.g.*, ████████████) to deliver the drugs to the customers.

13.    A summary of one of the 2025 New Hampshire controlled buys is included here as an example of the *modus operandi* mentioned above, and to show direct proof of drug dealing by ALEX and ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

7

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████

██    ████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████

*Large Seizure of Drugs from Residence and Vehicle of* ████████████████

15.     Following the undercover buys in early 2025 that were set up via the UC calling ALEX at the 7491 Number, ███████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████

██    ████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████  ALEX dropped the 7491 Number he had been using to operate the ALEX DTO.  ██







### Renewed Investigation into ALEX and DTO's Expanded Operations in Massachusetts

22.     Although ALEX dropped the 7491 Number in March 2025 ███████████, investigators were able to subsequently determine that ALEX had begun using the number ██████████ (the "6715 Number") as his new phone to operate the ALEX DTO. A subsequent review of phone records revealed that although the subscriber of this phone is unknown, the phone was activated on or about April 25, 2025.

23.     In July 2025, the UC re-engaged with ALEX via both texts and voice calls to the 6715 Number. Based on the renewed investigation into the ALEX DTO, including surveillance efforts, phone and in-person interactions between the UC and ALEX, and confidential informant reporting, it appeared to investigators that the ALEX DTO had begun to increasingly sell drugs in Massachusetts. In subsequent months, the UC made several controlled purchases from ALEX while investigators sought to identify other individuals and locations associated with the ALEX DTO. ██████████████████████████████████████████████, subsequent undercover purchases from the ALEX DTO all occurred in Massachusetts, and ALEX's subsequent drug runner(s) are believed to reside in Massachusetts.

### July 21, 2025 Controlled Purchase from ALEX and SALDANA MEJIA

24.     On July 21, 2025, the UC contacted ALEX on his 6715 Number to attempt another drug purchase from the ALEX DTO. Via texts on the 6715 Number, ALEX and the UC agreed for the UC to purchase 70 grams of fentanyl for a price of $700. Alex directed the UC to the area of Fernview Avenue in North Andover, Massachusetts, for a deal that evening.[3]

---

[3]     The text communications between the UC and ALEX's 6715 Number—both for this deal and the subsequent deals—have been preserved by the UC and have been reviewed by me.

25.     Around 6:00 p.m. on July 21, 2025, the UC arrived in the agreed-upon location and texted ALEX on the 6715 Number to confirm that the UC had arrived.  ALEX texted back using the 6715 Number and stated that his "guy" was 5 to 6 minutes away.  This was consistent with the ALEX DTO's *modus operandi* and law enforcement's operating understanding that ALEX was running a drug dispatch operation and would likely send a runner to deliver drugs.  Shortly after those texts with the 6715 Number, a white 2013 Subaru Impreza bearing Massachusetts registration 5WFS75 ("ALEX DTO Prior Vehicle") arrived in the area and backed into a parking spot.  The operator of the ALEX DTO Prior Vehicle was the lone occupant.

26.     This was the UC's first meeting with ALEX's new drug ███████████████ ███████████████████████████████████████████████████████████ ███████████.  At approximately 6:12 p.m., the UC received a call from the 6715 Number, and ALEX directed the UC to walk to the "white car," thus confirming that the vehicle nearby (*i.e.*, the ALEX DTO Prior Vehicle) was the vehicle being used by ALEX's drug runner.  The UC entered the ALEX DTO Prior Vehicle and met with ALEX's drug runner.  The UC provided the runner with $700 in U.S. currency.  In exchange, the drug runner who appeared on behalf of ALEX provided the agreed-upon drugs, which were believed to be approximately 70 grams of suspected fentanyl.  The drugs were provided to the UC in a clear plastic bag that contained 7 individual pressed and wrapped sticks of suspected fentanyl, each weighing approximately 10 grams.  This exhibit was sent to the DEA laboratory for analysis.

27.     The registered owner of the ALEX DTO Prior Vehicle was listed as ███████ ████████████████████████████████████.  Further investigation into this name led investigators to believe that this individual either did not exist or was not the actual owner or operator of the ALEX DTO Prior Vehicle.  As a result, investigators began further surveillance on

13

the ALEX DTO Prior Vehicle.  On July 28, 2025, investigators observed the ALEX DTO Prior Vehicle parked in front of 9 Boxford Street (the site of Target Location 2) in Lawrence.  Further surveillance showed a male exiting 9 Boxford Street and entering the ALEX DTO Prior Vehicle.  The UC confirmed that the male seen exiting 9 Boxford Street that day was the individual that the UC met to complete the drug purchase on July 21, 2025.  Based on RMV records and other analysis, investigators identified this individual as Jancer Elizandro SALDANA MEJIA.[4]

28.    A subsequent laboratory analysis of the drugs purchased from ████████ ███████████ ALEX and delivered by SALDANA MEJIA on July 21, 2025, shows that the net weight of the purchased drugs was 70.06 grams, and the seized drugs tested positive for both fentanyl and carfentanil.

### July 30, 2025 Controlled Purchase from ALEX and SALDANA MEJIA

29.    On July 30, 2025, the UC again contacted ALEX on the 6715 Number.  This time, ALEX and the UC agreed to the sale of 90 grams of fentanyl and a sample of methamphetamine for $900.  Like the prior deal, the UC was again instructed by ALEX that this deal would take place around 6:00 p.m. and would occur at Fernview Avenue in North Andover.  At approximately 5:50 p.m., investigators on surveillance watched as SALDANA MEJIA exited 9 Boxford Street in Lawrence (the site of Target Location 2) and entered the ALEX DTO Prior Vehicle.  Investigators were able to maintain surveillance on the ALEX DTO Prior Vehicle and watched SALDANA MEJIA drive directly from 9 Boxford Street in Lawrence (his residence and the site of Target Location 2) to Fernview Avenue in North Andover (the location of the deal).

---

[4]    The controlled purchases between July and September 2025 discussed in this affidavit were all audio-video recorded by the UC.  Although the video recordings are not always clear, some of the recordings show the individual identified as, and matching the pictures of, SALDANA MEJIA.

30.     At approximately 6:00 p.m., the UC observed the ALEX DTO Prior Vehicle arrive at the agreed-upon location.  Like the prior deal, SALDANA MEJIA was the operator and lone occupant of the ALEX DTO Prior Vehicle.  The UC entered the ALEX DTO Prior Vehicle and provided SALDANA MEJIA with the $900 in authorized funds.  In return, SALDANA MEJIA provided the UC with a clear plastic bag containing nine individually pressed and wrapped sticks of suspected fentanyl weighing approximately 90 grams in total (*i.e.*, approximately 10 grams each).  SALDANA MEJIA also provided the UC with a small clear plastic bag containing a clear crystalline substance weighing approximately 3.5 grams of suspected methamphetamine.  Following the drug sale to the UC, SALDANA MEJIA was surveilled back to 9 Boxford Street in Lawrence, the site of Target Location 2.

31.     This transaction was also recorded and surveilled.  This transaction helped further confirm SALDANA MEJIA's identification and participation in the drug conspiracy involving ████████████████ .  Included below is a picture of SALDANA MEJIA from the Registry of Motor Vehicles, along with a picture of surveillance from July 30, 2025 showing SALDANA MEJIA and the ALEX DTO Prior Vehicle:

 

The UC, a law enforcement officer who personally interacted with SALDANA MEJIA on this and other occasions, can also personally identify SALDANA MEJIA.

32.    A subsequent laboratory analysis of the drugs purchased from ALEX and delivered by SALDANA MEJIA on July 30, 2025, showed that the net weight of the nine sticks of suspected fentanyl was 90.13 grams, and these items tested positive for both fentanyl and carfentanil. The net weight of the clear crystalline substance was 3.27 grams, and the item tested positive for methamphetamine.

### *August 21, 2025 Controlled Purchase from ALEX and SALDANA MEJIA*

33.    On August 21, 2025, the UC texted ALEX on the 6715 Number and the two again agreed to the sale of 90 grams of fentanyl for $900. At approximately 5:10 p.m., the UC received a text from ALEX stating that the meeting location for this sale would be Pleasant Valley Street in Methuen, Massachusetts.

34.    Investigators again set up surveillance on 9 Boxford Street in Lawrence (the site of Target Location 2). At approximately 5:55 p.m., SALDANA MEJIA exited 9 Boxford Street and entered the ALEX DTO Prior Vehicle. Investigators then observed SALDANA MEJIA driving the ALEX DTO Prior Vehicle directly to Pleasant Valley Street in Methuen. The UC arrived at the agreed-upon location at approximately 6:15 p.m. and located the ALEX DTO Prior Vehicle. The UC then exited the UC's Vehicle and met with SALDANA MEJIA. The UC provided SALDANA MEJIA with $800 in approved funds. (The UC inadvertently left $100 in the UC vehicle, but the deal nonetheless went ahead.) In return, SALDANA MEJIA provided the UC with a clear plastic bag containing 9 individually wrapped and pressed sticks of suspected fentanyl.

35.    Included below is a picture of SALDANA MEJIA from the Registry of Motor Vehicles, along with a picture from within the ALEX DTO Prior Vehicle showing SALDANA MEJIA during the drug deal on August 21, 2025:

16

 

36.     A subsequent laboratory analysis of the drugs purchased from ALEX and delivered by SALDANA MEJIA on August 21, 2025, showed that the net weight of the purchased drugs was 89.59 grams, and these items tested positive for fentanyl.

### September 3, 2025 Controlled Purchase from ALEX and SALDANA MEJIA

37.     On September 3, 2025, the UC texted ALEX on the 6715 Number and ALEX agreed to sell the UC 100 grams of fentanyl for $1,000.  At approximately 5:00 p.m., the UC received a text from ALEX via the 6715 Number stating that the deal would occur around 6:00 p.m. on Kingston Road in North Andover, Massachusetts.

38.     Investigators again set up surveillance on the ALEX DTO Prior Vehicle on 9 Boxford Street in Lawrence (the site of Target Location 2).  SALDANA MEJIA was again observed exiting 9 Boxford Street, entering the ALEX DTO Prior Vehicle, and driving directly to the agreed-upon location for the drug sale.  At approximately 6:17 p.m., the UC located the ALEX DTO Prior Vehicle at the agreed-upon location.  The UC exited the UC vehicle and entered the passenger door of the ALEX DTO Prior Vehicle.  The UC provided SALDANA MEJIA with $1,100 in authorized funds and received a clear plastic bag containing ten individually pressed and wrapped sticks of suspected fentanyl. (The extra $100 on top of the agreed-upon $1,000 was to make up for the $100 shortfall that occurred during the deal on August 21, 2025.)

17

39.     A subsequent laboratory analysis of the drugs purchased from ALEX and delivered by SALDANA MEJIA on September 3, 2025, showed that the net weight of the purchased drugs was 99.67 grams, and these items tested positive for fentanyl.

***September 29, 2025 Controlled Purchase from ALEX and SALDANA MEJIA***

40.     To obtain further evidence about the activities of the ALEX DTO, on September 26, 2025, I submitted an affidavit in support of an application to obtain location information for the 6715 Number being used by ALEX, *see* 25-7443-JCB (under seal), as well as location information for the ALEX DTO Prior Vehicle being used by ALEX's drug runners, *see* 25-7444-JCB (under seal).  Investigators then conducted another controlled purchase that week to further confirm that ALEX was ████████████████ and that his runner would use the ALEX DTO Prior Vehicle to deliver the drugs ordered from ████████████████ "ALEX."

41.     On September 29, 2025, the UC placed a recorded call to ALEX at the 6715 Number and ordered 100 grams of fentanyl and 8 ounces of methamphetamine.  Later that day, SALDANA MEJIA met the UC in the ALEX DTO Prior Vehicle and delivered the agreed-upon drugs.  A subsequent laboratory analysis of the drugs purchased from ALEX and delivered by SALDANA MEJIA on September 29, 2025, confirmed that one package contained a mixture or substance containing approximately 223.31 grams of methamphetamine, and the other packages contained a mixture or substance containing approximately 99.9 grams of fentanyl.

42.     During these multiple controlled purchases, investigators observed SALDANA MEJIA at 9 Boxford Street in Lawrence, (the site of Target Location 2, believed to be his residence) on multiple occasions and observed SALDANA MEJIA going to and from 9 Boxford Street on occasions when he was believed to be dealing drugs in the ALEX DTO Prior Vehicle. Investigators also observed ████████████████ ("ALEX") at ████████████████

████████████████ on multiple occasions when investigators believe SALDANA MEJIA was coordinating the drug trafficking activities of the ALEX DTO. ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

43.     Based on the above, I believe there is probable cause to believe that ████████ ████████████ SALDANA MEJIA are part of the ongoing conspiracy by members of the ALEX DTO to distribute and possess with intent to distribute controlled substances.

***Change of Vehicles and Change of Drug Runners***

44.     Between October and December 2025, surveillance and ongoing investigative efforts continued to provide evidence that the ALEX DTO was distributing drugs. For example, on multiple days, investigators observed the ALEX DTO Prior Vehicle leaving its typical parking location at 9 Boxford Street in Lawrence, Massachusetts (the site of Target Location 2, the residence associated with SALDANA MEJIA), and driving around making suspected drug deals starting around 6 p.m. in the evening. On several occasions, investigators observed SALDANA

MEJIA leaving around 6 p.m. in the evening, driving to some street or parking lot, meeting someone for a short period of time in a manner that strongly suggested that a hand-to-hand drug transaction had taken place, and then driving to another street or parking lot to meet another suspected drug customer for another suspected drug deal. This pattern was consistent with the five controlled purchases that law enforcement made from the ALEX DTO via placing calls to ALEX, and where a member of the ALEX DTO (other than ALEX) showed up to various predetermined meeting locations in parking lots to deliver drugs during evening hours. The evidence showed a pattern of behavior indicative of the ALEX DTO sending a drug runner to deliver drugs during evening and nighttime hours to various customers throughout Lawrence, Methuen, and the surrounding communities.

45.     The location data from the tracking of the 6715 Number (ALEX's phone) and the ALEX DTO Prior Vehicle (combined with extensive surveillance) showed that ALEX would often remain at Target Location 1 during evening or nighttime hours, but ALEX's drug-runner (SALDANA MEJIA at the time) would spend much of the nighttime hours delivering drugs in parking lots in Lawrence, Methuen, and surrounding communities.

46.     Towards the end of 2025 and early in 2026, physical surveillance (aided by the prior warrants) indicated that the ALEX DTO had a new drug runner. Although prior observations (including the controlled purchases between July and September 2025, and surveillance in October and November 2025) showed SALDANA MEJIA as a drug runner for the ALEX DTO for much of 2025 (███████████████████████████████████), observations suggested that a new associate was now being used as a drug runner for the ALEX DTO. The patterns of movement of the ALEX DTO Prior Vehicle appear to remain the same (*i.e.*, going to drug dealing locations at nighttime hours under circumstances highly indicative of drug dealing), but a new runner other

than SALDANA MEJIA began appearing.   Investigators later identified this new runner, based on surveillance and RMV records, as Lorenzo Estiberson CASTILLO ENCARNACION.

47.     In February 2026, as investigators prepared to make another controlled purchase to help confirm the identity of the new drug runner for the ALEX DTO, the ALEX DTO changed the vehicle it was using to deal drugs. ███████████████████████████████████████

███████████████████████████████████████████████████████████████████████

48.     On February 25, 2026, investigators attempted to physically surveil the ALEX DTO Prior Vehicle, which had been used for many prior months to deliver drugs on behalf of the ALEX DTO.  Investigators noticed the vehicle parked in Lawrence for three days, a notable change in pattern from what investigators had observed previously.   That afternoon, the ALEX DTO Prior Vehicle moved and was located later that afternoon parked in the area of 73 Winthrop Avenue in Lawrence.  This is also the location of the Registry of Motor Vehicles service center in Lawrence. A short while later, investigators observed a male later identified as ██████████████████ exit the RMV carrying an opaque envelope with what appeared to be new registration plates inside. The male walked directly to the ALEX DTO Prior Vehicle, entered the driver's side, and drove away.  Investigators surveilled ██████████████████ to the area of 46 Tewksbury Street (Target Location 3, CASTILLO ENCARNACION's residence), where he parked and went in. When investigators ran the registration of a red Honda Accord parked at that location, the registration came back to CASTILLO ENCARNACION.  Investigators then also realized that the picture of that registered owner matched the new drug runner that investigators had been observing on surveillance in recent months.  This further confirmed for investigators that CASTILLO ENCARNACION (who had been driving the ALEX DTO Prior Vehicle) was part of the ALEX DTO drug conspiracy, and that ████████████████████████

██████████████ was also part of the ALEX DTO drug conspiracy and was helping CASTILLO ENCARNACION.

49. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████

*CASTILLO ENCARNACION and* ████████████████ ***Begin Using Target Vehicles***

50. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

██    ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████      ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████

52.     The next day, on March 5, 2026, investigators used a confidential source to re-engage with ALEX.  This source informed investigators that ALEX had informed the source to stop using his phone and start using the Signal encrypted app to place drug orders.  According to the CS, ALEX indicated that Signal would allow for the communications to be better protected. Through the confidential source, investigators introduced another undercover (UC) law enforcement agent, and the UC was able to engage in a UC buy of drugs that evening from the ALEX DTO.  In short, the parties arranged for the purchase of 50 grams of fentanyl and two ounces of methamphetamine.  The negotiations were conducted via the Signal app, which was monitored by investigators.  For purposes of this affidavit, I am not relying on any observations by the CS because the UC agent personally participated in the March 5, 2026 deal and is available to testify about it.  The UC was directed to a location in Andover, Massachusetts to complete the drug deal.

53.     As investigators set up surveillance for this March 5, 2026 drug deal, they were unsure which runner ALEX would send in which vehicle.  One possibility, based on the prior night's observations of drug dealing, was ████████████████████████████████ to deliver drugs on behalf of the ALEX DTO.  Another possibility was CASTILLO ENCARNACION, the observed drug runner in recent months, arriving to deliver drugs on behalf of the ALEX DTO.  While setting up surveillance for this deal, investigators identified a gray 2015

Subaru Impreza bearing Massachusetts registration 5SWR81 (Target Vehicle 1) near CASTILLO ENCARNACION's residence (Target Location 3).

### *March 5, 2026 Drug Sale by CASTILLO ENCARNACION Using Target Vehicle 1*

54.     On the evening of March 5, 2026, at the time and location of the prearranged drug deal for 50 grams of fentanyl and two ounces of methamphetamine, investigators observed Target Vehicle 1 (being driven by CASTILLO ENCARNACION) appear at the meeting location. During the subsequent deal, CASTILLO ENCARNACION handed over a clear plastic bag containing 5 off-white pressed powder cylinders (suspected to be fentanyl) and two bags of a clear crystalline substance (suspected to be methamphetamine). The purchased drugs were submitted to a DEA laboratory for chemical analysis. The UC was able to positively identify CASTILLO ENCARNACION as the person who transferred the drugs, and the person the UC met matched the RMV photograph of CASTILLO ENCARNACION.

55.

56.     A subsequent laboratory analysis of the drugs purchased on March 5, 2026 from ALEX and delivered by CASTILLO ENCARNACION (in Target Vehicle 1, a ████████████ ███████████████████) showed that one package contained approximately 50.59 grams of a mixture or substance containing fentanyl, and the other package contained 55.98 grams of a mixture or substance containing methamphetamine.

*March 18, 2026 Drug Sales by* ████████████████ *Using Target Vehicle 2*

██  ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

██  ██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████    ████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

███



██    ██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

██    ███████████████████████████████████████████████████████████████  ██

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

███████████████████████████

██  ████████████████████████████████████████████████████████████████  █

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

_____

█  ████  ████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████



***Additional Information on Target Locations***

64.    <u>Target Location 1</u>.  Target Location 1 is ███████████████

████████████████████████████████████████████████

████████████████████████████████████████████████



65.     During this investigation, cell site location data, visual surveillance, and electronic surveillance from a pole camera has consistently tied ███████████████ to this residence over the past few months, up to and through April 2026. ███████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████

66.    <u>Target Location 2</u>.  Target Location 2 is 9 Boxford Street, Apartment 2, Lawrence, Massachusetts.  Target Location 2 is the residence of SALDANA MEJIA.  Target Location 2 is part of a three-story building that is divided into multiple units.  The building appears to contain both 7 and 9 Boxford Street.  9 Boxford Street is accessed via a door on the front landing marked "9," which is believed to lead upstairs to the second and third floors.  Target Location 2 is believed to be the rear, second-floor apartment at 9 Boxford Street.  A picture of 9 Boxford Street is below:



67.    During the investigation, investigators observed SALDANA MEJIA going to and from 9 Boxford Street on numerous occasions, including immediately before or after conducting suspected drug deals.  As summarized above, SALDANA MEJIA delivered drugs to a UC on at least five occasions in 2025 after the UC called ALEX to order drugs.  On multiple occasions, investigators observed direct travel to or from 9 Boxford Street either before or after the drug deals.  Although investigators have not observed drug dealing by SALDANA MEJIA personally in recent months, they continue to believe that SALDANA MEJIA resides at Target Location 2.  For example, in recent months, SALDANA MEJIA obtained a new vehicle, 2015 Audi Q5, that is registered under his name and registered at the 9 Boxford Street, Apt. 2 location.  This vehicle,

owned and registered to SALDANDA MEJIA at Target Location 2 was observed at Target Location 2 as recently as April 6, 2026. Notably, during the prior drug deals involving ALEX and SALDANA MEJIA, based on surveillance, phone location data, etc., ALEX and SALDANA MEJIA did not meet between the time the UC ordered drugs from ALEX and when SALDANA MEJIA met the UC to deliver the drugs.  Thus, it is reasonable to conclude that ALEX and SALDANA MEJIA communicate using some electronic medium.  However, toll records on ALEX's phone do not show phone connectivity with SALDANA MEJIA either for the relevant periods.  Thus, investigators believe that ALEX or SALDANA MEJIA either have other phones or use encrypted apps on their phones to communicate with each other.  These electronic devices, which are likely to contain evidence of SALDANA MEJIA's involvement with the ALEX DTO, are part of the devices investigators hope to seize as part of a search of SALDANA MEJIA's residence.

68.    <u>Target Location 3</u>.   Target Location 3 is 46 Tewksbury Street, Lawrence, Massachusetts.   Target Location 3 is the residence of CASTILLO ENCARNACION.   46 Tewksbury Street appears to be part of a multi-unit home (44/46 Tewksbury Street) with blue cedar shake style siding.  Target Location 3 is believed to be accessed via a door on the side landing to this property.  CASTILLO ENCARNACION has been seen entering and exiting the door on this right side of the building.  This door is believed to lead up to a second-floor level, which is the believed location of Target Location 3 based on the building layout and the known names of individuals listed for the first floor who do not appear to be involved in this investigation.  A picture of the building and door used to access Target Location 3 is below:

32



69.     During this recent phase of this investigation, CASTILLO ENCARNACION has been repeatedly seen entering or exiting the door on the landing on the right side of 46 Tewksbury Street.   Electronic surveillance from the public street has continued to show CASTILLO ENCARNACION at this location.  Further, electronic surveillance has also shown Target Vehicle 1 (the vehicle that CASTILLO ENCARNACION drove to deliver drugs to the UC in March 2026) parked daily at 46 Tewksbury Street during recent weeks, including as recently as April 7, 2026.

70.     In addition to the March 2026 controlled purchased from ALEX and CASTILLO ENCARNACION, where CASTILLO ENCARNACION left Target Location 3 in Target Vehicle 1 and then completed the drug sale to the UC, investigators have also observed behavior on other days suggesting that CASTILLO ENCARNACION might take drugs from Target Location 3 when engaging in the evening drug dealing *modus operandi* that investigators have repeatedly observed. For example, on April 2, 2026, at approximately 6:05 p.m. (around the time ALEX's drug runners begin their nightly drug distribution activities), investigators observed CASTILLO

ENCARNACION exiting 46 Tewksbury Street (using the side landing discussed above) carrying a weighted plastic bag, as shown below:



CASTILLO ENCARNACION then got into Target Vehicle 1 and drove away.  He was observed returning to 46 Tewksbury Street in the early morning hours of April 3, 2026, again consistent with the *modus operandi* of the group selling drugs for most of the evening hours without needing to return home to resupply.  For example, on March 5, 2026, when CASTILLO ENCARNACION delivered drugs to the UC in Target Vehicle 1, investigators then surveilled CASTILLO ENCARNACION for a while longer during the evening.  Investigators observed CASTILLO ENCARNACION make at least five other suspected drug transactions while under surveillance.

71.    Target Location 4. Target Location 4 is █████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

34



**Requested Authority**

72.    Based on the information contained in this affidavit, I believe there is probable cause to believe that ███████████████████████ SALDANA MEJIA, CASTILLO ENCARNACION, ████████████████ are part of a conspiracy to distribute and possess with intent to distribute controlled substances.  Accordingly, I believe there is probable cause for a Criminal Complaint to issue charging each of these individuals with a violation of 21 U.S.C. § 846.

73.    Further, based on the information contained in this affidavit, I also believe there is probable cause to search the residences of ██████████████████████ SALDANA MEJIA (Target Location 2), CASTILLO ENCARNACION (Target Location 3), ██ ██████████████████████ for evidence, fruits, and instrumentalities of the Target Offenses.  ████████████████████████████

████████████████████████████████

███████████████████████

74.    In addition, based on the information contained in this affidavit, I also believe there is probable cause to search ████████████████████████████ Target Vehicle 1, believed to be used by CASTILLO ENCARNACION, ████████████ ████████████████ for evidence, fruits, and instrumentalities of the Target Offenses.  ████████████████████████████████

█████████████████████

*Drug Traffickers' Use of Residences and Cell Phones Generally*

75.    Based upon my experience and the experience of other law enforcement officers who have participated in the execution of numerous search warrants at residences used by drug

traffickers, I am aware that the following kinds of evidence has often been recovered during searches of residences used by drug traffickers:

    a.  Controlled substances and materials used to "cut" or dilute those substances.

    b.  Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances.

    c.  Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances.

    d.  Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers.

    e.  Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances.

    f.  Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

    g.  Labels for deliveries, receipts, and other documents pertaining to shipments.

    h.  Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the Target Locations.

    i.  Photographs, videos, or other records concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

    j.  Cellular telephones, and evidence that tends to identify the person having dominion and control over the cellular telephone.

76.    Based on my training and experience, and the collective experience of other investigators participating in this investigation, I know that traffickers of controlled substances frequently maintain quantities of illicit drugs to maintain their ongoing drug business. I also know that traffickers of controlled substances usually keep, in addition to drugs, paraphernalia for the packaging, diluting, cutting, weighing, processing, and distributing of controlled substances, including scales, plastic bags, cutting agents, and utensils at their residences or stash

locations.  Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for drug traffickers to store drug-related paraphernalia for longer periods of time than they keep drugs.

77.    Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for drug traffickers to maintain records relating to their drug trafficking activities.  Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances.  Often drug traffickers keep ledgers or "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers.  Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business. I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities for an extended period of time, regardless of whether they are physically in possession of drugs on the premises.

78.    Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that drug traffickers often possess or maintain firearms at their residences to protect their drug stashes or the proceeds of their drug trafficking.  Firearms are often used in furtherance of drug trafficking activities and often constitute evidence or instrumentalities of drug trafficking offenses.

79.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that it is generally a common practice for traffickers to conceal, at their residences, large sums of money, either proceeds from drug sales or monies to be used to purchase controlled substances.  Furthermore, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances.  Drug traffickers also often maintain one or more currency counting machines to aid in counting their drug proceeds.  Many experienced drug traffickers will often engage in money laundering to conceal the source of their drug proceeds and will use proceeds to purchase legitimate investments.  In other instances, drug traffickers will combine cash from their drug trafficking with cash deposits from other legitimate business activities in an attempt to hide their illegal conduct.  Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences.

80.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that drug traffickers generally try to hide cash and sensitive documents related to their drug trafficking and money laundering activities in safes, hidden compartments, or other containers so that other individuals who enter their residence do not discover these materials.

81.     Many drug dealers receive their drugs through overnight parcels and keep mailing labels both used and unused for future use.  Additionally, such drug traffickers often send the proceeds of their drug sales via overnight delivery, Western Union, and/or wire to their suppliers in order to pay for a continuing supply of drugs.  Such individuals will often maintain records of these transactions in case there is a later dispute concerning what funds were transmitted and when.

39

82.     During the searches of residences, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the residences.  Evidence of occupancy, residency, rental and/or ownership of the premises is relevant to the prosecution of the Target Offenses.  Furthermore, records of residency linking a person to a particular location are durable and are reasonably likely to be maintained for long periods of time for several reasons, such as record keeping.  Many documents and records are largely innocuous, or at least are perceived as such, while many documents and records have other utility.  For example, a person involved in the trade of illegal drug is unlikely to discard passports, licenses, titles to motor vehicles, bank books, address books, or bills.  These are necessary to prove ownership—even if they are in the name of a proxy—and they can be helpful when attempting to flee police.

83.     Based on training and experience, I know that most drug dealers regularly use cellular telephones to communicate about their drug trafficking activities with customers, suppliers, and other coconspirators.  Here, there is overwhelming evidence of the ALEX DTO using telephones to communicate about the distribution of controlled substances.  Because cellular telephones are often a principal means of communication, drug dealers typically keep the phones in close proximity.  Additionally, in my experience, many drug dealers do not dispose of their cellular telephones when getting a new number, but instead just discard them in various locations in residences or stash houses.  As a result, it is common to recover not only paper records pertaining to the use of a cellular phone by drug dealers, such as bills, call detail records, statements, and other documents, but the cellular telephones themselves, from residences used by drug dealers.

84.     Based upon my knowledge, training, and experience, I know that a cellular telephone is a handheld wireless device used primarily for voice communication through radio

signals.  These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities.  These capabilities include but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.  Based on my training and experience, I know that many cellular telephones have the capabilities described above.

85.    Seizure of devices containing this information will provide information relating to coconspirators and accomplices.  I know, based upon my training and experience, as well as consultation with other investigators, that individuals who sell illegal drugs typically use cellular telephones to communicate with their suppliers, their customers, and with other coconspirators, and that they communicate both via both voice calls and via email and/or text messaging.  I also know that persons who sell illegal drugs regularly keep records of their illegal activities.  These records can include, but are not limited to, contact list of buyers and sellers, ledgers of sales and money owed by customers or to suppliers, and lists of quantities and/or specific controlled substances preferred by or ordered by specific customers.  Individuals engaged in drug trafficking activities often take photographs of their closest confederates.  Records of drug trafficking activities can be produced and maintained on paper in a tangible form and/or by electronic means

41

on a cellular telephone. From my training and experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B on their cellular telephones.

86.    Additionally, I know that many drug traffickers often use cellular telephones to communicate quickly and economically with their suppliers and customers via the internet. I am also aware that individuals frequently use cellular telephones to create and store records of their actions by communicating with others through e-mail, electronic messages, and updates to online social-networking websites; keeping their calendars; arranging for travel; storing pictures; researching topics related to drug trafficking; and accessing their bank, financial, investment, utility, and other accounts online. Additionally, many cellular phones today have a GPS navigation device on the phone. Examination of the GPS data on a cellular phone can provide valuable evidence as to the locations where drug traffickers meet with coconspirators, including their sources of supply, and can aid in identifying those individuals. Additionally, review of GPS data can aid in identifying offsite locations where drug traffickers store drugs, maintain bank accounts, and conceal their drug proceeds.

87.    Based upon my training and experience, and information provided to me by others involved in the forensic examination of computers, I know that electronic data on cellular telephones can be stored in a variety of methods, including, but not limited to, within the memory of the cellular telephone; within volatile memory, such as RAM; or on removable media, such as memory cards. I also know that electronic data can often be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed. This is true because:

   a.    Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one.

42

b.      Even after files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time.  In addition, the device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.      Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it.  This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files.  It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

d.      Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  The browser on a cellular telephone often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

88.      Law enforcement agents will endeavor to search and seize only the phones which, upon reasonable inspection and/or investigation, appear to contain the evidence in Attachment B.

### *Seizure of Computer Equipment from the Target Locations or Target Vehicles*

89.      Based on my training, experience, and information provided by other agents, I know that many cell phones (which are included in Attachment B's definition of "hardware") can now function essentially as small computers. Cell phones have capabilities that include serving as a wireless telephone to make audio calls, digital camera, portable media player, GPS navigation device, sending and receiving text messages and emails, and storing a range and amount of electronic data.  Examining data stored on devices of this type can uncover, among other things, evidence of communications and evidence that reveals or suggests who possessed or used the device.  Further, information stored within a phone/computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation.

90.     Here, there is reason to believe that members of the ALEX DTO may be in possession of one or more cell phones, and it is quite likely that other phones (belonging to one or more co-conspirators) may be found at the Target Locations and Target Vehicles.   Accordingly, and for the avoidance of any doubt, this affidavit seeks authority to seize any cell phone or other hardware as described in Attachment B from the Target Locations or the Target Vehicles.

91.     Based on my training, experience, and information provided by other agents, I am aware that in order to completely and accurately retrieve data maintained in computer hardware, computer software, or storage media, to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that computer hardware, computer software, and storage media be seized and subsequently processed by a computer specialist in a laboratory setting rather than in the location where it is seized.   Consequently, law enforcement agents may either copy the data from the seized devices at either the locations where such devices are found, or agents may take the seized devices for subsequent processing elsewhere.

92.     The review of any electronic data contained on seized devices may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.   Pursuant to this warrant, investigators may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

### *Unlocking Seized Devices Using Biometric Features*

93.     From my training and experience, as well as from information found in publicly available materials published by device manufacturers, I know that many electronic devices,

particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features, and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

94.    If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through their fingerprints. For example, Apple offers a feature called "Touch ID" on certain models of Apple phones, which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of certain devices. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

95.    If a device is equipped with a facial-recognition feature, as many Android, Apple, and other devices are, a user may enable the ability to unlock the device through their face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of their face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face. Similar technology allows users to unlock a device specifically through iris recognition.

96.     In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password.  Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents.  This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

97.     As discussed above, I have reason to believe that one or more digital devices will be found during the searches.  The passcodes or passwords that would unlock the devices subject to search under the requested warrants is not known to law enforcement.  Thus, law enforcement personnel may not otherwise be able to access the data contained within the devices, making the use of biometric features necessary to the execution of the searches authorized by the warrants.

98.     I also know from my training and experience, as well as from information found in publicly available materials, including those published by device manufacturers, that biometric features will not unlock a device in some circumstances, even if such features are enabled.  This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time.  For example, certain Apple devices cannot be unlocked using Touch ID when a certain period of time has elapsed since the device was last unlocked and/or when the device has not been unlocked using a fingerprint and the passcode or password has not been entered in a certain period of time.  Similarly, certain Android devices cannot be unlocked with Trusted Face or fingerprint access if the device has remained inactive for a certain number of hours.  Other Android and Apple biometric features, and similar features from other brands, carry similar restrictions.  Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

46

99. In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose biometric features are among those that will unlock the device(s), and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it may be necessary for law enforcement to have the ability to require any occupant of the Target Locations or Target Vehicles to press their finger(s) against the sensor of the locked device(s) or place the devices in front of their faces in order to attempt to identify the device's user(s) and unlock the device(s).

100. Due to the foregoing, if law enforcement personnel encounter any devices that are subject to seizure pursuant to the requested warrants and may be unlocked using one of the aforementioned biometric features, this affidavit seeks authority for law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of a person found at the Target Locations or in the Target Vehicles to the fingerprint scanner of any devices found at the Target Locations or in the Target Vehicles; (2) hold the devices found at the Target Locations or in the Target Vehicles in front of the face of a person found at the Target Locations or in the Target Vehicles to activate the facial recognition feature; and/or (3) hold the devices found at the Target Locations or in the Target Vehicles in front of the face of a person found at the Target Locations or in the Target Vehicles to activate the iris recognition feature, for the purpose of attempting to unlock the devices in order to search the contents as authorized by the warrants. The proposed warrant does not authorize law

47

enforcement to compel that any person state or otherwise provide the password or any other means that may be used to unlock or access the devices. Moreover, the proposed warrant does not authorize law enforcement to compel the any person to identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices. I understand that if the any person refuses to cooperate, the matter must be resolved through contempt proceedings rather than through the application of unreasonable physical force.

101.    I further request that the Court authorize law enforcement to change device settings on any seized device(s) to disable "Stolen Device Protection," which is a security measure that can be used to prevent unauthorized access to the device and data. When enabled, however, this feature might prevent forensic tools from being able to extract data from devices.

/        /        /        /        /

I, John Corridan, hereby state under the penalties of perjury that the contents of this affidavit are true and correct to the best of my knowledge, information, and belief.

Respectfully submitted,

*John Corridan by JCB*

John Corridan
Task Force Officer, DEA

Sworn before me by telephone in accordance with the requirements of Federal Rule of Criminal Procedure 4.1 on April 8, 2026.

Hon. Jennifer C. Boal
United States Magistrate Judge
District of Massachusetts

48